UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

BUCK BAITS LLC
AND ANTHONY M.T. MAJEWSKI

       *Plaintiffs*,

v.

BELL'S BREWERY, INC.

       *Defendant*.

_____/

CASE NO.
Hon.

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs, Buck Baits LLC (hereinafter "Buck Baits") and Anthony M.T. Majewski (hereinafter "Anthony Majewski," and together with Buck Baits, "Plaintiffs"), by their attorney, as and for their Complaint against defendant Bell's Brewery, Inc. (hereinafter "Bell's" or Defendant), allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Buck Baits LLC is a limited liability company organized and existing under the laws of the State of Michigan with its principal place of business in Sterling Heights, Michigan.

2.    Plaintiff Anthony Majewski is an individual residing in Sterling Heights, Michigan.

3.    Defendant Bell's Brewery, Inc. is corporation organized and existing under the laws of the State of Michigan with its principal place of business in Galesburg, Michigan.

4.     Upper Hand Brewery ("Upper Hand") is a division of Bell's and is registered with the Michigan Department of Licensing and Regulatory Affairs as an assumed name of Bell's.

5.     This is a civil action arising under the laws of the United States, more particularly 15 U.S.C. § 1051 *et seq.*, and 15 U.S.C. § 1125.

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), to the extent that it arises under the laws of the United States, and pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, to the extent of the state law claims.

7.     Personal jurisdiction over Bell's is properly founded on Bell's being located in and actively conducting businesses within the Western District of Michigan.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) and/or (c), as well as 1400(a), in that Bell's is located in and conducts substantial business within this judicial district and a substantial part of the events or omissions giving rise to the claims occurred and continue within this judicial district.

## GENERAL ALLEGATIONS

9.     This case involves claims by Plaintiffs against Bell's seeking injunctive relief and recovery for Bells's unauthorized and intentional infringement of Plaintiffs' registered DEER CAMP trademark and other intellectual property to generate profits for Bell's at the expense of Plaintiffs.

### Plaintiffs' "Deer Camp" Trademark

10.     On December 19, 2015, Plaintiff Anthony Majewski applied to register the trademark "DEER CAMP" with the United States Patent and Trademark Office ("USPTO") for the following goods and services:

IC 030. US 046. G & S: Artificial coffee; Artificial coffee and tea; Beverages made of coffee; Beverages with a coffee base; Caffeine-free coffee; Chicory and chicory mixtures; all for use as substitutes for coffee; Chicory based coffee substitute; Chocolate bark containing ground coffee beans; Chocolate covered roasted coffee beans; Coffee; Coffee and artificial coffee; Coffee and coffee substitutes; Coffee and tea; Coffee based beverages; Coffee beans; Coffee beverages with milk; Coffee capsules containing coffee for brewing; Coffee essences; Coffee essences for use as substitutes for coffee; Coffee extracts; Coffee extracts for use as substitutes for coffee; Coffee flavored syrup used in making food beverages; Coffee pods; Coffee substitutes; Coffee substitutes; Coffee-based beverage containing milk; Coffee-based beverages; Coffee-based beverages containing ice cream (affogato); Coffee-based iced beverages; Coffee-based snack foods; Green coffee; Ground coffee beans; Iced coffee; Instant coffee; Mixtures of coffee and chicory; Prepared coffee and coffee-based beverages; Roasted coffee beans; Sugar-coated coffee beans; Unroasted coffee; Organic coffee; Fair Trade coffee.

11.     The DEER CAMP trademark was registered by the USPTO to Plaintiff Anthony Majewski on September 6, 2016 with registration number 5035248, with a date of first use in interstate commerce on November 3, 2015.  A copy of the trademark registration certificate is attached to this Complaint as Exhibit A.

12.     Pursuant to a license agreement, Majewski licensed the DEER CAMP trademark to Plaintiff Buck Baits, which is owned by his wife Julie Majewski, for use in connection with the Buck Baits "Deer Camp" product line, as described in this Complaint.

**Plaintiff Buck Baits**

13.     Buck Baits was founded in November 2015 and is a women-owned Michigan-based company that specializes in manufacturing and selling best in class hunting attractants, archery and hunting themed products and accessories.

14.     Buck Baits's products are targeted towards, among others, consumers who are hunting enthusiasts, archery enthusiasts, outdoor enthusiasts, fishing enthusiasts, trail and mountain hikers, and camping and RV enthusiasts (the "Buck Baits Target Customer").

3

15.     Buck Baits's archery and hunting consumer products line includes, among other things, a full line of animal natural urine attractants, lab certified urines at peak estrogen and or RT-QUIC tested cervid urine against chronic waste disease, synthetic deer scents, masking and food cover scents and attractants, game calls, odor elimination products, wind indicators, wicks and drag products for scent disbursement, deer mineral feed and baiting products, decal stickers, headwear, apparel, crossbow slings, food and beverage products, and tracker stacks.

16.     In addition to its archery and hunting product line, Buck Baits sells a variety of categories of branded products that are intended to appeal to the Buck Baits Target Customer including, but not limited to, themed coffee brands, drinkware including mugs and tumblers, headwear, apparel, decal stickers, insulated can coolers, and other accessories.

17.     Buck Baits products are sold nationally and internationally through sporting goods stores, hunting and archery specialty stores, "big box" stores, grocery and coffee stores, and online e-commerce stores, including major retailers such as Amazon.com, Overstock.com, Walmart.com, Sears, K-Mart, Academy Sports and Outdoors, Midwest USA, Cheaper Than Dirt, Great Lakes Ace Hardware and many others. Buck Baits products are also sold through mobile applications focused on archery and hunting such as the Sportsman Outdoor HuntWise® App.

18.     Buck Baits products are also nationally distributed through firearms, hunting, and archery distributors, including but not limited to Zander's Sporting Goods, Kinsey's Outdoors, and Kinsey South; previously known as Pape's Inc.

19.     Buck Baits products are also sold through consumer shows, trade shows, independent sales professionals, brokers, and buying groups.

20.     Many of Buck Baits's products incorporate REALTREE® camouflage patterns and are produced and sold as licensed REALTREE® products through an arrangement with

4

Jordon Outdoor Enterprises, Inc., a world leader in 3D camouflage patterns for the outdoor industry.

### Buck Baits's "Deer Camp" Coffee and Related Products

21.    In November 2015, Buck Baits launched its "Deer Camp" line of products.

22.    Like Buck Baits's other products, the Deer Camp line of products was designed to appeal to the Buck Baits Target Customer, and especially consumers in that group from the Upper Peninsula of Michigan, which was Plaintiffs' source of inspiration for the Deer Camp brand and is where Plaintiff Majewski owns property and enjoys spending time. Buck Baits staff members use Plaintiff Majewski's property in the Upper Peninsula of Michigan to conduct research on Buck Baits products. The Michigan Department of Natural Resources also uses Plaintiff Majewski's property for research in connection with their deer habitat conservation improvement program.

23.    The Deer Camp line of products currently includes a line of whole and ground coffee beans, flavored coffee, hot chocolate, and Deer Camp branded accessories such as mugs, tumblers, headwear, insulated can coolers, and decal stickers.

24.    The Deer Camp line of coffees includes varieties branded with hunting and outdoor themes such as "The Cabin," "The Rut," "Opening Day," "Deer Tracks Hazelnut," "Blaze Orange Pumpkin Spice," and others.

25.    The logo, trade dress, and packaging for Deer Camp coffee consists of multiple elements, including, among other things:

- The name DEER CAMP prominently placed on top in all upper-case letters;
- Hunting-related graphic elements, including a trophy buck, deer antlers, deer ears, rifle, rifle scope sight, and archery arrows;
- Solid colored stars with five points and an internal radius style;
- A circle as the dominant shape;

- The colors orange, yellow, brown, black, and white; and
- A 3D camouflage pattern (licensed from Jordon Outdoors, licensee of the Realtree® camouflage brand).

Plaintiffs' product catalog with examples of their logo, trade dress, and packaging design is attached to this Complaint as Exhibit B. A detailed analysis of the elements of Plaintiffs' logo, trade dress, and packaging design is attached to this Complaint as Exhibit E.

26. The Deer Camp product line is widely available to purchase at, among other places, Walmart.com, Amazon.com, Overstock.com, other online retailers, independently owned grocery and specialty stores, as well as through the Buck Baits website (http://www.buckbaits.com) and the Deer Camp Coffee website (http://www.deercampcoffee.com).

27. Buck Baits has gained strong commercial recognition of its Deer Camp coffee with the Buck Baits Target Customer by widely publicizing, promoting, and marketing it through multiple channels, including print, digital, television, out of home, mobile, donations/sponsorships, social media, digital streaming, consumer and industry tradeshows, partnerships and licensing, and pro-staffers. Each of these marketing channels is designed to reach the Buck Baits Target Customer.

28. Examples of such publicity, marketing, and promotions include, but are not limited to:

- National social media and online promotions, including the Buck Baits and Deer Camp Coffee websites, Twitter accounts, Facebook accounts, Instagram accounts, and others, including:

    o Facebook advertising on the Upper Peninsula of Michigan page, which has over 46,000 followers and covers U.P. Travel, Weather, News, Adventures, and lots of FUN across the Upper Peninsula of Michigan;

6

o Product appearances on the REALTREE® outdoor social media pages as well as on the REALTREE® website as a featured licensed product (*see* https://www.realtree.com/camo-products/deer-camp-coffee-packaged-in-realtree-xtra-green-camo). Deer Camp Coffee was also featured in the REALTREE® holiday gift guide (*see* https://www.realtree.com/timber-2-table-articles/timber2table-holiday-gift-guide-part-1);

o Product promotion through the social media accounts of Great Lakes Ace Hardware (Michigan's largest hardware store chain) in 2018 and 2019; and

o Product promotions through Buck Bait Pro Staffers, which consist of professional hunting guides, archery hunters, youth, and sporting good category managers across the country, who promote Buck Baits products on social media through use of video, interviews on podcasts, social media and consumer shows within their local communities;

- Print advertising in industry periodicals, including, but not limited to, Archery Trade Magazine, the Michigan DNR Gaming Rules Book, and posters in Great Lakes Ace Hardware locations throughout the State of Michigan;

- Television advertising and syndication since 2016 with National Outdoor Shows, Simply Outdoor TV, Mass Pursuit TV and Just Kill'n Time on the Pursuit Channel and affiliate networks Wild Pursuit Network and Pursuit Up anytime anywhere. Pursuit Channel is an American television network that reaches, engages and entertains over 80 million outdoor enthusiasts;

- Podcast advertising, participation, and sponsorship including, among others, the UP North Journal Podcast (Michigan's longest running outdoor and hunting related podcast) and the Archery Trade Association's live podcast;

- Out of Home (OOH) advertising on digital billboards in Kalamazoo, Lansing, and Metro Detroit;

- Sponsorship of and participation in numerous consumer shows, events, and wild game dinners, including, but not limited to:

  o Kinsey's Archery Dealer show (where the Deer Camp products are promoted to over 1000 archery trade retailers) since 2016;

  o Archery Trade Association Industry Trade Show (the largest archery and hunting trade show which attracts over 9000 attendees annually) since 2017;

o   The Woods-N-Water Outdoor Weekend (the largest consumer show for outdoors enthusiasts in Michigan) since 2016;

o   The Plaid Night Annual Hunting Show in Capac, Michigan since 2017;

o   The Michigan Sausage Festival in Warren, Michigan since 2018;

o   The Fraternal Order of Police Annual Wild Game Dinner in Warren, Michigan since 2017;

o   Kids On The Go, a nonprofit in St. Clair Shores, Michigan for children with autism in 2016; and

o   Curtis Michigan Baptist Church – Sponsor of one of largest Annual WILD GAME Dinner in the Upper Peninsula of Michigan free to surrounding community since 2016;

- Sponsorship of the Michigan DNR's "Michigan Pure Hunt" since 2016, which reaches over 750,000 hunters annually in the State of Michigan; and

- Promotions throughout Western Michigan University, Plaintiff Majewski's alma mater since 2016, where he has been honored as an outstanding young alumni from the Haworth College of Business.

**Expanding "Deer Camp" Coffee and the "Deer Camp" Brand Into Craft Beer**

29.   Like many coffee roasters and distributors, Buck Baits has taken steps to expand its Deer Camp coffee to related categories of products, including coffee infused beer, coffee flavored beer, and other types of beer.

30.   Like its Deer Camp coffee, Buck Baits's Deer Camp beer will be targeted towards the Buck Baits Target Customer.

31.   Buck Baits's expansion from coffee into craft beer is consistent with the widespread practices of: (1) companies that produce both coffee and craft beer under the same brand; (2) specialty cafes that specialize in both coffee and craft beers; and (3) coffee roasters and craft beer breweries that collaborate to create coffee infused and/or coffee flavored beers.

8

32.     These widespread practices that combine coffee and craft beer result from the fact that craft beer and coffee share the same market channels and customers.

33.     The fact that coffee and craft beer have common market channels and customers was confirmed by a survey conducted by Western Michigan University, in cooperation and with the support of the Brewers Association and local retailers, which involved an in-depth study of 1019 Midwestern supermarket shoppers who purchase craft beer.  Part of the study determined "what else do craft beer shoppers buy?" by conducting a so-called "affinity" or "basket analysis" by indexing all products found in 1,185,561 shopping baskets (or trips) that included craft beer (following the Brewers' Association definition of craft beer) for a 52-week period (between August 2015 and August 2016) and found that coffee was one of the most common categories of products found in a craft beer shopper's basket.  Marcel Zondag and Bart Watson, *White Paper: Who is the Craft Beer Shopper* (2017), *available at* https://s3-us-west-2.amazonaws.com/brewersassoc/wp-content/uploads/2017/09/White-Paper-Who-Is-the-Craft-Beer-Shopper.pdf.

34.     The authors of this study, Professors Zondag and Watson, used the results of this study to craft a custom plan for Bell's.  *See* https://wmich.edu/business/bells

35.     A November 2017 article in the New York Times also discussed the common market channels and customers for craft beer and coffee and the prevalence of companies that produce and sell both coffee and craft beer, noting that:

> Many brewers see a bridge connecting their day and night clientele. "The market is a natural crossover," said Sean Arroyo, the chief executive of Heritage Brewing and Veritas Coffee. "Most beer consumers are coffee consumers."
>
> Joshua M. Bernstein, *Breweries Find That Coffee Is Their Second Favorite Beverage*, New York Times (November 16, 2017), *available at* https://www.nytimes.com/2017/11/16/dining/drinks/beer-brewers-coffee-roasters.html

9

36.    A May 2019 article in The Brewer Magazine titled *"Consumer Crossover Opportunity: Breweries & Coffee"* similarly discussed the rise in companies that produce both craft beer and coffee and the overlap in consumers for craft beer and coffee. The article quoted Jamie Bartholomaus, the president and co-founder of Foothills Brewery, which produces both coffee and beer, as follows:

> "[It's a] pretty large crossover," Bartholomaus said of the type of consumer the brewery is targeting. "Most people who drink craft beer prefer high-quality coffee as well."
>
> Jon Sicotte, *Consumer Crossover Opportunity: Breweries & Coffee,* The Brewer Magazine (May 24, 2019), *available at* http://thebrewermagazine.com/consumer-%E2%80%8Bcrossover-opportunity%E2%80%8B-breweries-coffee/

37.    As a result of the large crossover of customers for craft beer and coffee, many companies produce and sell both coffee and craft beer.

38.    A few examples of the many companies that produce both coffee and craft beer include:

- Dark Horse Brewery in Marshall, Michigan, which also operates Dark Street Roasting Company & Coffee House;

- Modern Times, which has produced and sold coffee, craft beer, and coffee-infused craft beer under a single brand name since 2013;

- Two Brothers in Chicago, which produces both coffee and craft beer under a single brand;

- Oskar Blues, which produces and sells coffee, craft beer, and coffee-infused craft beer under a single brand;

- Heritage Brewing and its sister company Veritas Coffee, which share a brick and mortar location called "Heritage Brewing Market Common Brewpub and Roastery"; and

- Red Horn Coffee Roastery and Brewing, which was founded to put an equal emphasis on coffee and beer.

39. Further demonstrating the crossover in market and customer for coffee and craft beer are the many small specialty cafes that specialize in both coffee and craft beers. A few examples of such cafes include:

- Cultivate Coffee & Taphouse in Ypsilanti, Michigan, which roasts and sells coffee as well as craft beer and frequently holds events sponsored by Bell's, including "Bell's Presents - Trivia Night" and "Dark Night 2019 with Bell's Brewery";

- Taproom Coffee and Beer in Atlanta which is "dedicated to serving some of the best coffee in the world from partnering roaster East Pole Coffee Co. and a selection of spectacular craft beer from breweries in Atlanta and elsewhere"; and

- Kudu Coffee and Craft Beer in Charleston, South Carolina, which offers specialty coffees and over 20 taps of craft beer from local breweries as well as from breweries throughout the U.S. and Europe.

40. On a national scale, Starbucks Coffee has piloted a similar coffee and craft beer café concept through its Evenings program at certain stores by offering a selection of coffee and craft beer in the evening on the basis that "Starbucks customers are two times more likely to drink craft beer than the national average, according to Scarborough Research." *See* https://stories.starbucks.com/stories/2015/starbucks-evenings-stores/

41. Another result of the large crossover of customers for craft beer and coffee is the prevalence of beer companies that produce and sell coffee-infused or coffee-flavored beer, often in partnership with specific coffee roasters or coffee brands.

42. The prevalence of coffee-infused and coffee-flavored beer and its importance to the craft beer industry was highlighted in an October 2018 Chicago Tribune article which discussed the interrelation of the coffee and beer markets and stated that:

Coffee has become such a prominent ingredient [in beer] that it's far more difficult to think of a brewery that hasn't incorporated coffee into a brew than a brewery that has. We've seen coffee as the only adjunct added to a beer, showcasing its roasted muscularity. We've seen it threaded with layers of other

11

ingredients, to create a broader, more nuanced whole. We've even seen breweries wading into the coffee business, including Two Brothers, Marz Community Brewing, Oskar Blues and Dark Horse. . . . The earliest examples of coffee in beer, at least in the modern era of American brewing, date to the mid-1990s, which not coincidentally is the time craft beer broke through the national consciousness; Seattle's Redhook Brewing, Delaware's Dogfish Head Craft Brewery and Wisconsin's New Glarus Brewing each released a coffee stout. . . . In the succeeding years, two more coffee beer legends came out: Founders Brewing, of Grand Rapids, Mich., released Breakfast Stout, a chocolate coffee oatmeal stout, and Three Floyds Brewing, of Munster, Ind., launched Dark Lord (and gave it its own day), a stout made with coffee, Mexican vanilla and Indian sugar.

Josh Noel, *Why the intersection of coffee and beer has become a dominant force in craft brewing*, Chicago Tribune (October 2, 2018), *available at* https://www.chicagotribune.com/dining/drink/ct-food-coffee-beer-1010-story.html

43.     In fact, for over a decade after the Brewers Association first introduced the coffee flavored beer category at the 2002 Great American Beer Festival, the overall winners across all categories had been exclusively stouts or porters infused with coffee. *See* Brian Yaeger, *Discover the Lighter, Brighter Side of Coffee Beers* (December 10, 2018), *available at* https://www.craftbeer.com/craft-beer-muses/discover-the-lighter-brighter-side-of-coffee-beers.

44.     Today, almost all craft beer breweries offer at least one coffee-infused or coffee-flavored-beer. As discussed in this Complaint, Bell's itself produces at least nine (9) different coffee-infused or coffee-flavored beers.

45.     One subset of the hundreds of example of craft breweries that brew coffee-infused or coffee-flavored beers involve collaborations between specific coffee brands and craft beer breweries to create coffee-infused or coffee-flavored beers with specific brands of coffee – some examples in Michigan include:

- Bell's "Java Stout" beer, which is brewed with a custom blend of coffee beans roasted by Water Street Coffee Joint in Kalamazoo, Michigan;

- Bell's "Milchkaffee," which is brewed with a blend of coffee beans roasted by Kalamazoo Coffee Company;

12

- Bell's Upper Hand Brewery's "Fluffalo" beer, which is enhanced with the addition of coffee grounds from U.P. North Roast Coffee in Escanaba, Michigan;

- Saugatuck Brewing Company's "Uncommonly Tweaked" beer, which is brewed with organic Peruvian El Cautivo Coffee Beans from Uncommon Coffee Roasters in Saugatuck, Michigan;

- Founder's Brewing Company's "Sumatra Mountain Brown" beer, which is brewed with Sumatra coffee sourced by Ferris Coffee and Nut Co. in Grand Rapids, Michigan;

- Right Brain Brewery's "CEO Stout" beer, which is brewed with locally roasted espresso beans from Roaster Jack Coffee Co. in Traverse City, Michigan; and

- Short's Brewing Company's "Cup A Joe Coffee Creme Stout" beer, which is brewed with roasted fair trade espresso beans from Higher Grounds Coffee in Traverse City, Michigan.

46.     National coffee brands have also capitalized on this trend by partnering with beer breweries, including Dunkin' Donuts Coffee's collaboration with Harpoon brewery to create "Harpoon's Dunkin' Coffee Porter," and WaWa's (a convenience store chain with its own coffee blends) collaboration with 2SP Brewing Company to create four coffee-themed beers.

47.     More recently, some beer companies have also began producing "hard coffee" which combines coffee with alcohol content. For example, in 2019, Molson Coors introduced its partnership with Philadelphia-based La Colombe coffee to produce PBR Hard Coffee, which is a cold brew coffee product with 4.2% alcohol by volume. Horseshoe Beverage Company, a contract producer of coffee-based ready-to-drink beverages, has also introduced a coffee drink called the Brown Bomber Hard Latte with 5% alcohol by volume.

48.     Since 2015, Buck Baits has had discussions with potential partners and distributors related to its expansion into Deer Camp branded beer and related products.

49.     Buck Baits has created mock label for its "Deer Camp Beer," a copy of which is attached to this Complaint as Exhibit C.

13

50.  In 2015, Buck Baits obtained the domain name www.deercampbeer.com.

51.  Buck Baits's website at www.deercampbeer.com states that Buck Baits is "[c]urrently licensing independent craft brewers" for "Premium Craft Beers and Selections Featuring Deer Camp® Coffee Blends."

52.  On December 2, 2019, Plaintiff Majewski filed an application related to his earlier registration number 5035248 to register the DEER CAMP trademark with the USPTO for Plaintiffs' intent to expand use of their DEER CAMP products to the following goods:

IC 032. US 045 046 048. G & S: Beer, ale, lager, stout and porter; Malt liquor

IC 021. US 002 013 023 029 030 033 040 050. G & S: Coffee mugs; Coffee cups, tea cups and mugs; Insulating sleeve holder for beverage cups; Insulating sleeve holder for bottles; Insulating sleeve holders for beverage cans; Tumblers for use as drinking glasses; Beverage glassware; Drinking glasses, namely, tumblers

53.  As of the date of this Complaint, Plaintiff Majewski's related trademark application is awaiting review by the USPTO examining attorney.

### Defendant Bell's Brewing Company, Inc. and its Upper Hand Brewery Division

54.  Bell's is a family-owned brewing company that has been producing craft beer since 1985.

55.  Bell's is reportedly the oldest existing craft brewery in Michigan and, as of 2019, the largest independently owned brewery in Michigan and one of the largest craft breweries in the United States.

56.  Bell's produces several year-round packaged beers, and numerous seasonal and limited-production beers.

57.  Like most craft breweries, Bell's is in the coffee-infused and/or coffee-flavored beer market and produces several coffee flavored and/or coffee infused beers, including:

14

- Bell's Arabicadabra Coffee Milk Stout, which "is brewed with a cold coffee extract made at the brewery using a combination of fair trade, organic Nicaraguan coffee beans and Sumatra coffee beans";
- Bell's Java Stout, which is brewed "[u]sing a fresh, custom blend of coffee beans roasted locally in Kalamazoo by Water Street Coffee Joint";
- Bell's Porter, which includes "[n]otes of chocolate, coffee and roasted barley";
- Bell's Special Double Cream Stout, which includes "notes of rich mocha and espresso";
- Bell's Milchkaffee, which is brewed with a blend of coffee beans roasted by Kalamazoo Coffee Company;
- Bell's Goin' Dark, which is a coffee milk stout brewed with bourbon barrel-aged coffee beans;
- Bell's Kalamazoo Stout, which includes "flavors of dark chocolate and freshly roasted coffee"; and
- Bell's Vanilla Black Note Stout, which is described as "[a] malty harmony of dark chocolate, espresso and dried fruit note."

58.     In November 2014, Bell's opened a new division of its company called Upper Hand Brewery in Escanaba, Michigan.

59.     The Upper Hand website (http://www.upperhandbrewery.com/) describes their business as follows:

> We're a crew of hikers, campers, dog-walkers, anglers, hunters, bikers and folks that just want to get out there. We believe that life's mission is to do what you love, where you love, with the people you love. For us, that means brewing the best beer we can, in the best place on Earth: Michigan's Upper Peninsula.
>
> We put a lot of thought into brewing beer that reflects what we love about where we live. We have the unique opportunity to try and capture an experience—a sense of place—in each and every beer, and we take it seriously. That's not to say we don't have a lot of fun. The U.P. is full of adventures and we love making beer that makes those adventures even better.

60.     The Upper Hand website (http://www.upperhandbrewery.com/faq/) further states that "[a]lthough we are a division of Bell's Brewery, Inc., we are a completely separate brewery and we brew an entirely different portfolio of beers unique to our U.P. home."

61.     Despite this stated separation, however, Bell's markets and sells its own beers and its Upper Hand beers together at retail outlets, national trade shows, and other events.

62.     Like the Buck Baits Target Customer, Upper Hand's target customer includes hunting enthusiasts, archery enthusiasts, outdoor enthusiasts, fishing enthusiasts, trail and mountain hikers, and camping and RV enthusiasts, and especially consumers in that group from the Upper Peninsula of Michigan.

63.     Upper Hand produces and sells beers with names such as "Yooper Ale," "Upper Peninsula Ale," Laughing Fish," and others intended to appeal to this target audience.

64.     Like Bell's, Bell's Upper Hand Brewery division Bell's is in the coffee-infused and/or coffee-flavored beer market and produces coffee flavored and/or coffee infused beers including its "Fluffalo" beer which is "enhanced with the addition of U.P. North Roast Coffee grounds."

**The USPTO Refused Bell's Federal Trademark Application for "Deer Camp" Because it Causes a Likelihood of Confusion with Plaintiffs' Registered Deer Camp Trademark**

65.     On October 4, 2017, Bell's filed an application to register the trademark DEER CAMP with the USPTO, serial number 87633009, for "Insulating sleeve holders for beverage cans" in Class 21 and "Beer, ale and porter; Stout; Malt liquor" in Class 32.

66.     Defendant's trademark application was filed under Section 1(b) on the basis of Defendant's "intent to use" the trademark in the future.  Accordingly, Defendant had not yet used the trademark in interstate commerce as of October 4, 2017, the date on which the trademark application was filed.

67.     On January 16, 2018, the USPTO issued an office action denying Defendant's application for the DEER CAMP mark under Section 2(d) of the Trademark Act due to of a likelihood of confusion with the Plaintiffs' existing DEER CAMP mark in U.S. Registration No. 5035248. A copy of the office action (excluding its exhibits) is attached to this Complaint as Exhibit D.

16

68. The USPTO examining attorney noted that "Trademark Act Section 2(d) bars registration of an applied-for mark that so resembles a registered mark that it is likely a potential consumer would be confused, mistaken, or deceived as to the source of the goods of the applicant and registrant" and further stated that in this case the relevant factors to consider were (1) similarity of the marks; (2) similarity and nature of the goods; and (3) similarity of the trade channels of the goods.

69. In considering the similarity of the marks, the USPTO examining attorney stated that "[i]n the present case, applicant's mark is DEER CAMP and registrant's mark is DEER CAMP. These marks are identical in appearance, sound, and meaning, and have the potential to be used . . . in exactly the same manner."

70. In considering the similarity and nature of the goods and the trade channels for the goods, the USPTO examining attorney noted that "[t]he compared goods need not be identical or even competitive to find a likelihood of confusion" and further stated that even though registrant's trademark was for coffee-related products and applicant was applying for beer-related products, "applicant's and registrant's goods are considered related for likelihood of confusion purposes" based on:

> The attached Internet evidence consists of webpages from Modern Times, Two Brothers Artisan Brewing, and Wartega. The website evidence from Modern Times demonstrates that it brews and sells beer, in addition to producing coffee in the form of coffee beans. Modern Times also sells coffee tumblers, which are arguably related to applicant's insulated sleeve holders for beverage cans. The website evidence from Two Brothers Artisan Brewing shows that it brews and sells beer and also produces fresh coffee. Finally, the website evidence from Wartega highlights its beer and coffee. This evidence establishes that the same entity commonly produces the relevant goods and markets the goods under the same mark, and the relevant goods are sold or provided through the same trade channels and used by the same classes of consumers in the same fields of use.

71.    As a result, the USPTO examining attorney concluded that "because confusion as to source is likely, registration [of the Bell's DEER CAMP trademark] is refused under Trademark Act Section 2(d) based on a likelihood of confusion."

72.    Although the Bell's DEER CAMP trademark had been refused registration, the USPTO examining attorney invited Bell's to respond to the refusal by submitting evidence and arguments in support of registration within six months.

73.    Bell's did not submit any arguments or evidence in response to the examining attorney's rejection of its DEER CAMP trademark application.

74.    Accordingly, the USPTO declared the Bell's DEER CAMP trademark application to be abandoned on July 17, 2018.

### Defendant's Infringing "Deer Camp" Products

75.    Despite being notified by the USPTO that its proposed use of the DEER CAMP trademark infringed upon Plaintiffs' trademark rights, Bell's nonetheless moved forward and began selling beer and related merchandise such as insulated can holders, stickers, signs, lip balms, tap handles, and more under the DEER CAMP mark through its Upper Hand Brewery division beginning in the fall of 2018.

76.    Like the other beer and merchandise marketed through the Bell's Upper Hand Brewery division, Bell's "Deer Camp" beer and related merchandise is targeted toward consumers who are "hikers, campers, dog-walkers, anglers, hunters, bikers and folks that just want to get out there," which is the same target market as the Buck Baits Target Customer for Plaintiffs' Deer Camp coffee and other products.

77.    Defendant's "Deer Camp" beer is marketed and sold through the same or similar trade channels as Plaintiffs' Deer Camp coffee and other products.

18

78. The trade dress of Bell's packaging of its Deer Camp beer and related merchandise contains numerous identical and/or similar elements to the trade dress of Plaintiff's Deer Camp coffee and related merchandise, including, but not limited to:

- The name DEER CAMP prominently placed on top in all upper-case letters;
- Hunting-related graphic elements, including a trophy buck, deer antlers, deer ears, rifle, rifle scope sight, and archery arrows;
- Solid colored stars with five points and an internal radius style;
- A circle as the dominant shape;
- The colors orange, yellow, brown, black, and white; and
- A 3D camouflage pattern.

79. A side by side comparison and analysis of Plaintiffs' Deer Camp logo, trade dress, and packaging and Defendant's infringing Deer Camp logo, trade dress, and packaging design is attached to this Complaint as Exhibit E and clearly demonstrates the substantial overlap and similarities between them.

80. Defendant's Deer Camp beer logo also contains a logo for Upper Hand Brewery in it, with an outline of the upper peninsula of Michigan and the words "Est 2014" but contains no reference to Bell's.

**Plaintiffs' Notices of Infringement to Defendant**

81. On November 15, 2019, the opening day of deer hunting, Plaintiff Anthony Majewski first learned of Defendant's trademark infringement when he walked into Chamberlin's Ole Forest Inn in the Upper Peninsula of Michigan and some patrons at the bar who were acquaintances of Majewski and aware of Plaintiffs' Deer Camp coffee told Majewski that Chamberlin's was carrying his Deer Camp beer.

82. These patrons exhibited actual confusion as to the source and sponsorship of Bell's "Deer Camp" beer by Plaintiffs.

83.    When Plaintiff Majewski asked the restaurant's owner about the beer, he was told that it was produced by a small independent brewery in the Upper Peninsula.

84.    Upon further inquiry and research, Plaintiff Majewski learned that the infringing product was produced by Upper Hand Brewery, which was actually a division of Bell's.

85.    On November 20th, 2019, in response to a telephone message left by Plaintiff Majewski for Upper Hand regarding the trademark infringement claim, Plaintiff Majewski was contacted by Scott Powell, V.P. Director of Marketing of Bells Brewery.   It was during this call that Plaintiff Majewski first learned that Upper Hand was not an independent brewer but was in fact a division of Bell's. Mr. Powell indicated he had to gather Plaintiffs' information as he was not authorized to make decisions and would notify Bell's executive management.  Mr. Powell never responded to Plaintiffs after this call.

86.    On November 21, 2019, Plaintiffs sent a letter to Griffin Beverage Company, a distributor for Bell's and the infringing DEER CAMP beer, notifying them of Bell's trademark infringement.

87.    On November 23, 2019, Plaintiffs sent a letter to G. Patrick Sage, trademark counsel of record for Bell's, demanding that Bell's immediately cease and desist from infringing Plaintiffs' DEER CAMP trademark.

88.    On November 27, 2019 (the day before Thanksgiving), Plaintiff Anthony Majewski received a telephone call from Larry Bell, Founder of Bell's, in response to the cease and desist letter in which Mr. Bell refused to cease and desist use of Plaintiffs' registered trademark or to enter into a licensing agreement with Plaintiffs and implied that he would make it difficult or impossible for Plaintiffs to expand their product line into the beer category if they continued down that path.

20

89. On December 10, 2019, Plaintiffs sent a follow-up letter to Bell's, again demanding that Bell's immediately cease and desist from infringing Plaintiffs' DEER CAMP trademark.

90. Late in the evening of December 23, 2019 (the night before Christmas Eve), Plaintiff Anthony Majewski received a response to his cease and desist letters to Bell's via e-mail from Sarah Robertson at the Dorsey law firm in New York City, an attorney for Bell's, in which Bell's once again refused to cease and desist use of Plaintiffs' registered trademark or to enter into a licensing agreement with Plaintiffs and which implied that Bell's would consider somehow taking action against Plaintiffs for use of their own trademark that Bell's is infringing.

91. Accordingly, Plaintiffs were left with no choice but to file this Complaint to protect their trademark and other rights.

92. In addition to the cease and desist notices to Bell's, Plaintiffs have sent similar cease and desist letters to multiple coffee and craft beer companies that have used the Plaintiffs' "Deer Camp" trademark, all of which have complied with the letter. Most recently, on December 9, 2019, Plaintiffs sent a cease and desist letter to Grand River Brewery, which had produced and distributed beer labeled "Deer Camp." In response to Plaintiffs' cease and desist letter, Grand River Brewery informed Plaintiffs that they would cease and desist from further use of the Plaintiffs' trademark.

<u>**COUNT I – FEDERAL TRADEMARK INFRINGEMENT**</u>

93. Plaintiffs reallege Paragraphs 1 through 92 as if fully set forth herein.

94. Plaintiffs are the owner and licensee of the DEER CAMP trademark, which was registered by the USPTO to Plaintiff Anthony Majewski on September 6, 2016 with registration number 5035248.

95. Plaintiffs first used the DEER CAMP trademark in interstate commerce on November 3, 2015.

96. Defendant has been using the DEER CAMP trademark in commerce since the fall of 2018, and Defendant's use of the DEER CAMP trademark, as complained of herein, constitutes infringement of Plaintiffs' federally registered trademark in violation of 15 U.S.C. § 1114(1).

97. Defendant's activities create a likelihood of confusion, mistake, or deception as to the affiliation, connection, or association of Defendant's Upper Hand Brewery products with Plaintiffs' products, and as to the origin, sponsorship or approval of Defendant's Upper Hand Brewery products by Plaintiffs. Defendant's conduct is likely to induce ordinary consumers to believe, contrary to fact, that Defendant's Upper Hand Brewery products are rendered, sponsored, sold, or approved by or connected with Plaintiffs.

98. Due to the large size and reach of Bell's and its cross-promotion and sales of its Bell's beers and Upper Hand beers, Defendant's activities also create a likelihood of confusion, mistake, or deception as to the affiliation, connection, or association of Plaintiffs' products with Defendant's products, and as to the origin, sponsorship or approval of Plaintiff's products by Defendant. Defendant's conduct is likely to induce ordinary consumers to believe, contrary to fact, that Plaintiffs' products are rendered, sponsored, sold, or approved by or connected with Defendant, thus causing Plaintiff to lose the value of its registered trademark, product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

99. Defendant's conduct has caused damage to Plaintiffs in an amount to be determined at trial and, unless restrained, will continue to seriously and irreparably impair the

value of Plaintiffs' registered mark, for which there is no adequate remedy at law. Plaintiffs have also been forced to incur attorney's fees and other costs in this regard.

100. Defendant's activities are without approval, permission, or authority by Plaintiffs. In fact, prior to Defendant's first use of the trademark in commerce, the USPTO notified Defendant that their use of the mark infringed upon Plaintiffs' registered trademark. In addition, Plaintiffs have demanded that Defendant cease using Plaintiffs' trademark. However, Defendant has nonetheless continued its use after receiving notice from the USPTO and Plaintiffs' demands. Thus, Defendant's acts complained of herein have been malicious, fraudulent, deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights in its registered marks, and with an intent to trade on the goodwill associated with those marks. In light of the egregious nature of Defendant's infringement, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a), and therefore Plaintiffs request treble damages.

## COUNT II – COMMON LAW TRADEMARK INFRINGEMENT

101. Plaintiffs reallege Paragraphs 1 through 100 as if fully set forth herein.

102. By virtue of Plaintiffs' continuous use of the DEER CAMP mark in connection with Plaintiffs' Deer Camp line of products since 2015, Plaintiffs acquired common law rights in connection with the DEER CAMP mark.

103. Defendant began using the same mark as is owned by Plaintiffs in the fall of 2018 to identify related goods to those offered by Plaintiffs with the same target market and marketing channels as Plaintiffs' goods.

104. Defendant's activities are without the permission or approval of Plaintiffs, which own the mark.

105.   Defendant's actions have resulted in the likelihood of confusion as to the origin or sponsorship of its products and convey the false and misleading impression that Upper Hand's products are endorsed by, sponsored by, or affiliated with Plaintiffs.  Upper Hand has been and will continue to unfairly trade upon and appropriate the prestige, reputation, notoriety, fame, and goodwill of Plaintiffs' mark, and is thereby deceiving the public.

106.   Due to the large size and reach of Bell's and its cross-promotion and sales of its Bell's beers and Upper Hand beers, Defendant's activities also create a likelihood of confusion, mistake, or deception as to the affiliation, connection, or association of Plaintiffs' products with Defendant's products, and as to the origin, sponsorship or approval of Plaintiff's products by Defendant.  Defendant's conduct is likely to induce ordinary consumers to believe, contrary to fact, that Plaintiffs' products are rendered, sponsored, sold, or approved by or connected with Defendant, thus causing Plaintiff to lose the value of its registered trademark, product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

107.   Defendant's conduct is the direct and proximate result of significant damages to Plaintiffs, which continue to accrue.

108.   Defendant's use of the Plaintiffs' mark has caused damage to Plaintiffs in an amount to be determined at trial and, unless restrained, will continue to seriously and irreparably impair the value of Plaintiffs' mark, for which there is no adequate remedy at law.  Plaintiffs have also been forced to incur attorney's fees and other costs in this regard.

## COUNT III – UNFAIR COMPETITION IN VIOLATION OF § 43(a) OF THE LANHAM ACT AND COMMON LAW OF VARIOUS STATES

109.   Plaintiffs reallege Paragraphs 1 through 108 as if fully set forth herein.

24

110. Defendant's actions have caused, or likely will cause, confusion as to the origin or sponsorship of its Upper Hand products and convey the false and misleading impression that Plaintiffs provide, sponsor, or endorse the Upper Hand products sold by Defendant.

111. Defendant continues to unfairly trade upon and appropriate the prestige, reputation, notoriety, fame, and goodwill of Plaintiffs, as well as the national brand, brand loyalty, and widespread goodwill associated with Plaintiffs, and are thereby deceiving the public.

112. Accordingly, Defendant's acts constitute unfair competition within the meaning of the Lanham Act, 15 U.S.C. §1125(a) and the common law of various states.

## COUNT IV – UNJUST ENRICHMENT

113. Plaintiffs reallege Paragraphs 1 through 112 as if fully set forth herein.

114. Defendant has and will continue to obtain substantial benefit from its unauthorized use of Plaintiffs' trademark in connection with Defendant's products.

115. Plaintiffs have not received compensation for Defendant's unauthorized use of Plaintiffs' trademark in connection with Defendant's products.

116. Accordingly, Defendant has been unjustly enriched by its retention of the benefits from its unauthorized use of Plaintiffs' trademark without compensation to Plaintiffs. Allowing Defendant to retain such benefits would be inequitable and would result in Defendant's unjust enrichment at Plaintiffs' expense.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as follows:

A. Entry of an Order pursuant to Fed. R. Civ. P. 65 preliminarily and permanently enjoining the Defendant, its agents, affiliates, employees, and all persons in concert or participation with Defendant from: (1) directly or indirectly infringing upon Plaintiffs' registered and common law DEER CAMP trademark or any colorable imitation thereof; and (2) continuing

any and all acts of unfair competition by using Plaintiffs' DEER CAMP trademark or any other colorable imitation thereof; and

B.     Ordering Defendant to account to Plaintiffs for any and all profits derived by Defendant from its unauthorized use of Plaintiffs' DEER CAMP trademark and for all damages sustained by Plaintiffs by reason of Defendant's acts of infringement and unfair competition complained of in this Complaint, and that such amounts be held in a constructive trust for the benefit of Plaintiffs; and

C.     Awarding Plaintiffs:

a.     All damages sustained by Plaintiffs by reason of the wrongful acts complained of herein; and

b.     All profits derived by Defendant's wrongful acts complained of herein; and

c.     Punitive and exemplary damages against Defendant and in favor of Plaintiffs in an amount sufficient to deter and punish Defendant for its willful and wrongful acts; and

d.     Plaintiffs' costs incurred in this action; and

e.     Plaintiffs' attorney fees pursuant to 15 U.S.C. § 1117(a) or, in the alternative, on equitable grounds; and

D.     Such other and further relief, in law or equity, as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated: January 20, 2020

Respectfully submitted,

By:

Zachary V. Moen (P72029)
Attorney for Plaintiffs
ZVMLaw
455 East Eisenhower Parkway, Suite 300
Ann Arbor, Michigan 48108
Phone: (734) 794-3070
zak@zvmlaw.com